# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONNA F. MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | *Civil Action No. 7977-VCG* |
| | ) | |
| | ) | |
| NATIONAL LAND PARTNERS, LLC, | ) | |
| LEON HUNTER WILSON, and | ) | |
| HUNTER COMPANY OF WEST | ) | |
| VIRGINIA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 19, 2014
Date Decided: June 11, 2014

Michael P. Kelly and Daniel J. Brown, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware; OF COUNSEL: James P. Campbell, of CAMPBELL FLANNERY, P.C., Leesburg, Virginia, Attorneys for the Plaintiff.

Daniel F. Wolcott, Jr., of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, and Nicholas J. Brannick, of COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A., Wilmington, Delaware, Attorneys for Defendant National Land Partners, LLC.

Joanne P. Pinckney and Kevin M. Capuzzi, of PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; OF COUNSEL: Charles F. Printz, Jr., of BOWLES RICE LLP, Martinsburg, West Virginia, Attorneys for Defendants Leon Hunter Wilson and Hunter Company of West Virginia.

GLASSCOCK, Vice Chancellor

In November 2008, Plaintiff Donna Miller and Defendant Leon Hunter Wilson were engaged in divorce litigation in West Virginia. They were also each 50% owners of a West Virginia corporation, Defendant Hunter Company of West Virginia. On November 21, 2008, a West Virginia state court, the Berkeley County Family Court, entered an order directing the payment of approximately $4.9 million from Wilson to Miller, in return for which Wilson would receive Miller's half interest in Hunter Company; this decision has since been reversed and remanded. Hunter Company was the partner of Defendant National Land Partners, a Delaware limited liability company, in several real estate development projects. Shortly after the entry of the order directing him to pay approximately $4.9 million to Miller, Wilson caused Hunter Company to pay roughly that amount to National Land Partners. According to Wilson, this payment was owed under Wilson's agreements with National Land Partners. Miller disagrees, and considers the payment a fraudulent conveyance to avoid satisfaction of the Berkeley County Family Court's order. She brought this action, seeking a declaratory judgment confirming her theory, as well as imposition of a trust over the money paid to National Land Partners. The parties agree that the operative agreements between Hunter Company and National Land Partners did not, as written, require the payment, but the Defendants contend that that is because the written agreements inadvertently left out language making Hunter Company responsible for "negative

2

management fees," which language represented the true agreement among the Defendants.

This matter is presented on cross-motions for summary judgment, and the issue before me is a narrow one: was the payment to National Land Partners required by the agreements between Wilson, Hunter Company and National Land Partners? In order for me to reach that conclusion, the burden is on the Defendants to demonstrate, in effect, that the agreements should be reformed to include the missing term regarding negative management fees. This is a high burden; nonetheless, for the reasons that follow, I conclude that the agreements did contain this term, and that the Defendants are entitled to judgment.

## I. FACTS

While married, Plaintiff Donna Miller and Defendant Leon Hunter Wilson each owned a 50% interest in Defendant Hunter Company of West Virginia ("HCWV," and together with Wilson, the "Hunter Defendants"), a real estate development company incorporated in West Virginia.[1] Wilson is HCWV's President, performs the functions of CEO and, since his separation from Miller, has also become involved in the managerial aspects of HCWV.[2] Prior to their divorce,

---

[1] *See, e.g.*, Trial Tr. 99:15-100:1, 100:13-101:10.
[2] JX 41 (Wilson Aff.) ¶ 1.

3

Miller also served as an officer and director of HCWV.[3] Together, Wilson and Miller are the sole directors of HCWV.[4]

Early in their careers, both Miller and Wilson worked for Patten Corporation, a real estate company owned by Harry S. Patten.[5] Patten has since sold his interest in that company and, in 1999, founded Land Partners, LLC ("Land Partners"), a real estate development company that changed its name to National Land Partners, LLC ("National Land Partners") in September 2002.[6] National Land Partners is incorporated in Delaware and managed by American Land Partners, Inc. ("American Land Partners").[7] Patten serves as an officer of both National Land Partners and American Land Partners.[8] Alan Murray is National Land Partners' CFO and American Land Partners' Vice President.[9] Murray is also an officer of Inland Management Corporation, which manages various financial and human resources functions for National Land Partners, such as its payroll,

---

[3] *See* JX 39 at 4 ("Donna Miller has not resigned as an Officer or Director nor has she conveyed her stock to Hunter Wilson.").

[4] *See* July 31, 2013 Oral Arg. Tr. 34:1-2 (explaining that Wilson and Miller "are the sole officers, sole directors, sole shareholders" of HCWV).

[5] *See* Trial Tr. 37:5-7, 98:8-9, 397:24-398:2.

[6] *Id.* at 36:13-38:3; JX 7.

[7] Trial Tr. 34:16-18; JX 7.

[8] Trial Tr. 34:4-6, 35:3-6.

[9] *Id.* at 247:16-23. The record makes clear that, while CFO is not Murray's official title, he acts in that capacity for National Land Partners; as with other aspects of National Land Partners' business, the operations of personnel was somewhat informal.

accounts payable, accounting, financial statement preparation, tax reporting, and marketing.[10]

Wilson's business relationship with Patten began in 1986.[11] In the 1990s, Wilson began managing real estate development projects for Patten in West Virginia through HCWV.[12] Wilson, who has approximately twenty-seven years of experience in land development,[13] also has an educational background in forestry.[14] Consequently, many of the Defendants' projects also include a timber sales component.

To facilitate these joint projects, National Land Partners owns the properties through a wholly-owned subsidiary, WV Hunter, LLC.[15] National Land Partners, moreover, is responsible for the accounting and financial aspects of these projects, for which HCWV acts as an independent contractor.[16] Generally,

> [u]nder the parties' arrangement, the role of [HCWV], through Wilson, includes identifying property that would qualify for development, completing due diligence and feasibility studies to determine if [National Land Partners] should purchase the property, conducting engineering and design work, obtaining all permits and

---

[10] *Id.* at 245:13-247:3, 248:4-10; *see also id.* at 106:18 (Wilson) (noting that "Inland Management's owned by [National Land Partners]").

[11] *Id.* at 103:24-104:3.

[12] *See, e.g., id.* at 38:18-20, 99:7-101:10.

[13] JX 41 (Wilson Aff.) ¶ 1.

[14] Trial Tr. 97:14-19.

[15] *See, e.g., id.* at 252:10-22 (Murray) ("WV Hunter, LLC is a single-member limited liability company owned by National Land Partners. When National Land Partners does projects, it forms a limited liability company in each of the states that we are doing projects as a way of segregating revenues and expenses really for income tax reporting. . . . WV Hunter, LLC . . . owns the real estate that is managed by [HCWV].").

[16] *See, e.g.,* JX 9 at §§ 5.1-5.2; JX 11 at §§ 5.1-5.2; JX 17 §§ 5.1-5.2.

subdivision approval and overseeing the construction of infrastructure. Following completion of road and utility systems, [HCWV] oversee[s] [National Land Partners] employees serving as a sales force, conducting advertising, marketing and other promotions, selling the building lots and overseeing closings of properties.[17]

Wilson does not have any ownership interest in National Land Partners.[18]

A. *The Management Agreements*

At trial, Patten emphasized that he "like[s] doing business with people who you can trust and shake their hand and a deal's a deal."[19] In accordance with this principle, Patten and Wilson traditionally negotiated the details of each project orally, confirming their agreements with a handshake.[20] As Wilson testified:

> . . . most of our deals were done on handshakes. I will tell you that right now. I've shook hands with that man on more deals, and that's the way we did business. And it always seemed to work. No one ever got hurt. . . . I can remember a lot of deals that were never anything more than a handshake.[21]

However, as National Land Partners continued to grow, the Defendants began to convert their informal agreements into written contracts.[22] Consequently, over the years, the Defendants have entered into several management agreements, each

---

[17] JX 40 (Murray Aff.) at ¶ 4; *see also* Trial Tr. 100:15-101:10.
[18] *Id.* at 103:19-20.
[19] *Id.* at 74:21-23; *see also id.* at 44:8-11 (". . . I pride myself on keeping my agreements. My word is my word. And [Wilson's] always been that way with me and I've always been that way with him.").
[20] *See, e.g.*, *id.* at 35:24-36:12, 44:7-11, 74:21-75:2.
[21] *Id.* at 105:14-24.
[22] *See, e.g.*, *id.*; *see also id.* at 74:21-75:2 (Patten) ("I like doing business with people who you can trust and shake their hand and a deal's a deal. But I've been trained and harassed into documentation, doing contracts and all those things . . . that I hate to read.").

drafted by Murray.[23]  Among other things, these management agreements governed the profit allocation between HCWV and National Land Partners.

In addition to the management agreements, the Defendants also negotiated schedules for each project, subsequently codified by Murray, which contained the "budget-type numbers" for each project.[24]  Each schedule was associated with a particular management agreement.  Miller did not participate in negotiating the terms of these management agreements or associated schedules, and was never a signatory to any of these agreements, although Wilson kept her apprised of HCWV's relationship with National Land Partners throughout the years.[25]

Several agreements among the Defendants are pertinent to this litigation; for ease of reference, these agreements are also outlined in Figure I.  On July 17, 2000, Wilson, HCWV, and Land Partners entered into a management agreement that governed the Berkeley Glen and Meadows at Sleepy Creek Projects (the "2000 Management Agreement").  On January 15, 2002, Wilson, HCWV, and Land

---

[23] *See id.* at 249:14-250:5.

[24] *Id.* at 254:14; *see also id.* at 107:4-11 (Wilson) ("Alan Murray and I would work on management agreements and schedules to management agreements to make sure that we got the payback periods, the projected sales each month, the scheduling on when we thought construction money was going to be spent, so we were hoping sales would flow in, cash flow to project.  But Alan Murray and I would work on the last parts of that together."); *id.* at 254:7-14 (Murray) ("[Patten and Wilson] would work out the basic terms, I call it the terms from 50,000 feet.  They would determine how the profits would be shared.  They would discuss who was going to provide financing, where it would come from.  And then they would turn that, the process of drafting the contract, over to me, and I would work with Hunter Wilson to plug in a lot of the budget-type numbers that fall into the schedule."); *id.* at 432:9-14.

[25] *See, e.g.*, *id.* at 409:10-410:2; *see also id.* at 409:23-410:2 (Miller) ("[Wilson] was always emphatic about me knowing and understanding the highlights of our agreements, the ones that were most significant to he and I, borrowing money.").

7

Partners entered into another management agreement, effective as of September 26, 2001, which governed the River Ridge Project (the "2002 Management Agreement"). On October 15, 2002, Wilson, HCWV, and National Land Partners entered into a project addendum, which governed the Ashton Woods Project; this agreement was terminated on April 14, 2003 (the "Project Addendum"). On April 14, 2003, the Defendants entered into a management agreement, effective as of October 15, 2002, which governed the Ashton Woods, Crossings on the Potomac, and Westvaco Romney Tract ("Westvaco") Projects (the "2003 Management Agreement"). On December 3, 2004, the Defendants entered into another agreement in order to adjust the allocation of timber sales, which was effective as of November 3, 2004 (the "2004 Management Agreement").[26] The 2004 Management Agreement governs the following projects: Westvaco Greenbrier Tract – Hart's Run, the Pointe, and the Long Project. National Land Partners, Wilson, and Wilson's Virginia company, Hunter CO of VA, LLC, also entered into a management agreement on August 18, 2006, effective as of August 8, 2006, which governs the Black Diamond Ranch Project (the "2006 Management Agreement").

---

[26] *See, e.g.*, *id.* at 153:3-7, 296:9-19.

8

B. *Profit Allocation for the Defendants' Joint Projects*

As reflected in the 2000 Management Agreement, National Land Partners and HCWV initially divided profits and losses from each project evenly. However, the parties aimed for a profit of 25% of gross sales and, by late 2001, certain projects had failed to generate this expected return.[27] Patten, at trial, explained:

> [W]e had a string of properties and projects that weren't going well that we didn't make money on. And it was my desire to at least, if I'm investing money, putting time into it—and we invested quite a bit of money in those projects—to have some kind of a minimal return, or a return.[28]

Consequently, Wilson and Patten agreed to modify their arrangement so that National Land Partners was guaranteed a fixed rate of return.[29] Pursuant to this new arrangement, National Land Partners received a preferential profit of 12.5% gross sales. As Murray noted:

> The purpose of the Preferential Profit provision of the Management Agreements was to ensure that potential Projects identified by [HCWV] (through Wilson) were consistent with [National Land Partners'] profit expectations [of at least 25% of sales], and generated a return to [National Land Partners] of 12.5% of sales.[30]

---

[27] *See, e.g.*, *id.* at 39:1-23; JX 40 (Murray Aff.) ¶ 12.

[28] Trial Tr. 39:10-16; *see also id.* at 115:24-116:5.

[29] *See, e.g.*, *id.* at 411:16-21 (Miller) ("[W]e were not doing well. We had personnel issues. We had at least two projects that were very weak, if not three. And so it was somewhat of a half-halt from [Patten] to [Wilson]. And as I said, [Wilson] wasn't happy about it, but we understood.").

[30] JX 40 (Murray Aff.) at ¶ 12; *see also* Trial Tr. 263:10-19 (Murray) (noting that "this arrangement was Mr. Patten's way of incentivizing Hunter Wilson to bring him projects that had at least a 25 percent operating profit, and in the event that he did not, it put all the risk on Mr. Wilson").

9

This arrangement meant that after National Land Partners received its preferential profit, HCWV would receive the balance.  In the event that gross sales fell short of the preferential profit, however, HCWV would be responsible for any shortfall.[31]

The 2002 Management Agreement between the Defendants, which governed the River Ridge Project, was the first agreement to reflect this preferential profit arrangement.  Specifically, Section 6.2 of that Agreement provides, in relevant part:

> Profit participation by [Land Partners] and [HCWV] shall be as follows: [Land Partners] shall receive a profit participation equal to 10% of gross lot sales and 12.5% of gross timber proceeds.  [HCWV] shall receive all remaining Net Profit.  In the event that the amount of [Land Partners] profit participation calculated in accordance with the preceding formula exceeds the total Net Profit, then [HCWV] shall receive no profit participation and shall be liable to [Land Partners] for any shortfall amount.[32]

The language providing that HCWV would be liable for any shortfall amount—the "shortfall language"—provided for what the Defendants refer to as "Negative Manager Fees."  Negative Manager Fees, in other words, are those fees incurred by HCWV when a project fails to generate sufficient gross sales to satisfy National Land Partners' preferential profit.  For clarity's sake, I adopt the Defendants'

---

[31] JX 40 (Murray Aff.) at ¶ 12.

[32] JX 5 at NLP000156; *see also* Trial Tr. 59:16-22 (Patten) (noting that National Land Partners received 10% of gross sales—as opposed to 12.5%—because it was absorbing "a 2 1/2 percent fee to a finance person, the person who loaned us money"); *id.* at 257:5-20, 264:21-265:4.

convention of referring to HCWV's payment of such fees as "Negative Manager Fees."

Wilson explained at trial that the 2002 Management Agreement was "the first agreement where we switched ourselves over to a fixed return, so that [Patten] acted more like a bank and got a guaranteed rate of return on his investment."[33] Similar to a bank, Wilson explained, "if the project didn't do good, [Patten] still wanted his certain rate of return."[34] According to Wilson, therefore, this arrangement "meant that if I did extremely good on the projects, I got it all [above the preferential profit]. And if I didn't, then I had to pay the shortfall."[35]

C. *Miller Contends that the Defendants Agreed to Eliminate Negative Manager Fees During a Trip to Bermuda in July 2002*

Business negotiations between Wilson and Patten often took place informally, including while the men were vacationing together. Although Miller often accompanied Wilson on these trips, she testified that "[Wilson] and [Patten]

---

[33] *Id.* at 116:20-23; *see also id.* at 107:14-18 (Wilson) ("There's always been one or two deals with [Patten]. It's either been a 50/50 deal, which is the way we all started, and then later on we went to a fixed return, so that they were more like a banker that knew what they were going to get."); *id.* at 119:14-22 (Wilson) ("[Patten] gave me the opportunity to make a lot of money. But also, in the same sense on his fixed return, if the project didn't do good, he still wanted his certain rate of return. Would be no different than going out here and borrowing $100,000 from the bank for one year at 10 percent. They want their $10,000 at the end of the year whether you did good or not. That's the way our business has always been like that.").

[34] *Id.* at 119:16-17.

[35] *Id.* at 117:22-24; *see also id.* at 108:5-9 ("[National Land Partners] wanted a guaranteed rate of return, and . . . [HCWV] got all the upside, or [HCWV] had all the downside, too. I mean [HCWV was] responsible for what happened if [a project] went south.").

11

would never talk about business in front of anybody."[36] Nevertheless, Miller may have been present during informal discussions regarding business, such as those taking place over meals.[37]

In July 2002, Miller and Wilson vacationed with Patten in Bermuda. According to Miller, it was during this trip—where the parties discussed the Ashton Woods Project—that Wilson and Patten agreed to eliminate Negative Manager Fees, such that the River Ridge Project—the only project governed by the 2002 Management Agreement—would be the only joint project where HCWV could incur Negative Manager Fees.

By July 2002, Wilson had identified Ashton Woods as HCWV's next prospective project; according to Miller, "[h]e said it was our home run, it was the Superbowl, it was the World Series all rolled into one."[38] Miller recalls that she and Wilson discussed pursuing Ashton Woods without a partner but that, "[o]ut of loyalty and [Wilson's] relationship with [Patten], [Wilson] convinced me that if he and [Patten] could make the deal right, get rid of the guarantee, that we should do

---

[36] *Id.* at 419:6-7; *see also id.* at 53:3-5 (Patten) (noting that he "made it a practice never to discuss business—[he] always discussed it in private, with any of [his] associates").

[37] *See, e.g., id.* at 51:11-15 (Patten) ("I never had a business meeting with Hunter Wilson when his wife was there. We may have had talk over a dinner table or cocktails where she may have attended, but she was never, ever in a meeting."); *id.* at 105:9-11, 118:8-13; *id.* at 124:17-20 (Wilson) ("[Miller] wouldn't have participated [in negotiations] unless she heard something over dinners, drinks, or if she happened to go out on the boat with us for a day or so, or she heard me talking to her after the fact.").

[38] *Id.* at 416:1-3.

the [Ashton Woods] deal with [Patten]."[39] Correspondingly, and based on her conversations with and observations of Wilson, Miller contends that, while in Bermuda, Wilson successfully negotiated to eliminate the preferential profit guaranteed by HCWV to National Land Partners. This meant to Miller that "the slap on the hand that we got from River Ridge [governed by the 2002 Management Agreement and including Negative Manager Fees] would now be gone."[40]

Although Miller testified at trial that Wilson and Patten reached an agreement to eliminate Negative Manager Fees during this Bermuda trip, she acknowledged:

> I didn't know the details. You know, I always waited for [Wilson] to tell me. I never butted in, especially when he spoke with [Patten]. But when we were in private, he said that he has got it worked out. It is going in the right direction. He needs to iron out with [Murray], as always, the new management agreement.[41]

Despite not being privy to the negotiations that took place between Wilson and Patten in Bermuda, a few things stood out to Miller about this trip. First, she remembered that "[Wilson] would talk to me when he would come back from fishing with [Patten], tell me what was going on. He was worried about going to

---

[39] *Id.* at 416:20-417:5; *see also id.* at 418:20-24 (Miller) ("[T]he goal was for [Wilson] to present [Patten] what the project had going for it, to agree to change the management agreement, to get a commitment so that [Wilson] could move on and know what we were going to do with the project.").

[40] *Id.* at 417:12-13; *see also id.* at 417:13-17 (explaining that "we had never had a guarantee before that. It was supposed to be for the [River Ridge] project; let's see what happens after that. Let's see if we even do any more deals together after that.").

[41] *Id.* at 420:23-421:5.

the trip, I remember. And when it was over, he was a lot happier."[42] Miller, seemingly, believes that Wilson's happiness was caused by the elimination of Negative Manager Fees.[43] Second, Miller emphasized that one evening during dinner, Patten told her that "he would be making a little bit more profit on this project, on Ashton Woods, but it was such a great deal that [Wilson] and I were going to make it up in the end . . . ."[44] National Land Partners contends that "the reason [it] was going to make more on the Ashton Woods project is that Wilson and Patten agreed that the 2.5% of sales payable to mezzanine lenders, which had been absorbed by [National Land Partners] under the [2002 Management Agreement], would be considered a cost of the Ashton Woods project, boosting [National Land Partners'] return."[45]

---

[42] Transmittal Aff. of Nicholas Brannick to National Land Partners' Pre-Trial Op. Br. Ex. 10 (Miller Dep. Vol. I) at 20:22-21:1.

[43] Notably, the Ashton Woods Project was expected to generate large profits, and Miller was asked at trial how this expectation influenced Wilson's mood:

> Q. And that knowledge, the fact that you were going to make millions off this project, that's what Mr. Hunter Wilson was happy about when he went to Bermuda, isn't it?
> A. Well, he did enjoy the money; that's for sure.
> Q. But that's what he was happy about, isn't it?
> A. [Wilson] is not as shallow as that, I would like to say. I mean, it was not completely because of the money. This was—this project was putting him on a map on a lot of levels in his own head, and he deserved it.
> Q. Nobody was thinking about negative manager fees in this project, were they?
> A. Well, if you had asked that and River Ridge had not existed in between, who knows what would have happened?

Trial Tr. 475:7-24.

[44] *Id.* at 421:9-12.

[45] National Land Partners' Post-Trial Op. Br. at 10 n.10 (citation omitted); *see also* Trial Tr. 269:1-5 (Murray) ("Under this agreement, and because the previous project had been so

14

At trial, Patten testified that, although he and Wilson may have discussed the upcoming Ashton Woods Project while in Bermuda, they did not reach any agreement "to change the allocation of profits and losses."[46] Wilson also denied negotiating with Patten to eliminate Negative Manager Fees while in Bermuda, noting:

> Basically what [Miller's deposition] says, it says that I was over-the-moon happy about the deal, and she said I had negotiated away the negative number, or the guarantee of numbers. The guarantee to [Patten]. That's just not true. I can tell you it's not true, because I signed this addendum three months later—two, three months later when I signed this addendum. And one thing Harry Patten has done is stuck to his word and done what he was going to do, and I've done the same. So I did not—if I was happy and excited if I had a chance to make 10 or $11 million on a piece of ground and I've never done that before in my life, yeah, I'm going to be jumping up and down and dancing. I guarantee you I was happy. There's no doubt about it. I knew the deal was a slam-dunk home run.[47]

Three months after the Bermuda trip, HCWV, Wilson, and National Land Partners entered into a Project Addendum, which provided for the accrual of Negative Manager Fees, as described in more detail below.

---

successful, Mr. Patten and Mr. Wilson agreed that the 2-1/2 percent override would not be segregated but it would be a project expense. . . .").

[46] *Id.* at 45:17-20; *see also id.* at 54:19-22.

[47] *Id.* at 129:2-18.

D. *Following the Bermuda Trip, the Defendants Enter into a Project Addendum that Provides for Negative Manager Fees*

In October 2002—post-Bermuda—the Defendants entered into a Project Addendum designed to facilitate National Land Partners' goals of converting its project managers into members, and of eventually taking the company public.[48]

Despite Miller's testimony that Wilson and Patten agreed while in Bermuda to eliminate National Land Partners' guaranteed profit, the Project Addendum— entered into after that trip—maintained the preferential profit arrangement first reflected in the 2002 Management Agreement, including the associated Negative Manager Fees. Specifically, Section 6.2 of the Project Addendum provides, in relevant part:

> [National Land Partners] shall receive a profit participation equal to 12.5% of gross lot sales, 12.5% of the first $3 million of gross timber proceeds and 42.5% of the gross timber proceeds in excess of $3 million. In the event that the amount of [National Land Partners] profit participation calculated in accordance with the preceding formula exceeds the total Net Profit, *then [HCWV] shall receive no profit participation and shall be liable to [National Land Partners] for any shortfall amount*. All profit participation of [National Land Partners] shall be allocated among the Class 1 Members of [National Land Partners] and [HCWV] shall have no interest in such amounts.[49]

---

[48] *See, e.g.*, *id.* at 122:7-10; *id.* at 268:4-13 (Murray) ("This document was created at a time when Mr. Patten envisioned a couple of things. He envisioned National Land Partners being able to go public, and he wanted to provide for Hunter Wilson and other managers to be equity owners of National Land Partners. This was the first step, although it never—we never went any further than this document, this would have been the first step to calling them project members. The next step would have been to actually grant them some equity in the project.").

[49] JX 9 at HUNTER000101-102 (emphasis added).

At trial, Wilson testified that "this project addendum is no different than the agreement before [it]. Since it was [a] fixed rate of return and it wasn't 50/50, if the project did great, I did great. If the project didn't do great, [National Land Partners] still got [its preferential profit]. And it had the shortfall language in it, but that was the deal. And that was the deal we all lived by."[50] Wilson also noted that because this Project Addendum was a "brand new document," he "would have read it very closely."[51]

E. *The Project Addendum is Terminated as the Defendants Return to the Management Agreement Format*

The Project Addendum proved to be unpopular among National Land Partners' various partners, the plan to eventually bring the partners in as members was abandoned, and National Land Partners soon returned to the original management agreement format.[52] According to Murray, when the parties transitioned from the project addendum form back to the management agreement form, "[t]he terms were supposed to be identical."[53]

---

[50] Trial Tr. 126:5-11.

[51] *Id.* at 130:14-16.

[52] *See, e.g.*, *id.* at 136:15-137:1; *id.* at 279:16-21 (Murray) ("We abolished that, the [project addendum] form, and terminated the agreement. It was a result of confusion that was being caused by our all of a sudden calling people project members and Mr. Patten's decision that taking the company public was probably not something that was going to happen.").

[53] Transmittal Aff. of Nicholas Brannick to National Land Partners' Pre-Trial Op. Br. Ex. 9 (Murray Dep.) at 73:15-16; *see also* Trial Tr. 279:21-280:1 (Murray) ("So we simply did away with the project addendum and the schedule to [the] project addendum and replaced them with what we thought were identical management agreements and schedule to management agreement."); *id.* at 283:19-22.

In fact, the Ashton Woods Project, managed by HCWV, was governed first by the Project Addendum, and then, after the Addendum's termination in April 2003, by the 2003 Management Agreement.[54] As Wilson testified at trial, "[a]ll we did was change [the] form of documents. Any negotiation or anything that was done with this deal was done with Harry in July of '02, the year before. We already had the deal running. We weren't going to change horses in the middle of the road."[55] He further said the deal was not changed because

> [d]uring this time frame, [HCWV] was doing extremely well, and we were doing extremely well under this agreement. And there was no need to even discuss it. I mean it was—at that time it was full-bore down the road, you can go as hard as you can go. Because as fast as you can get it ready to go to market is as quick as somebody could buy it. So there was nothing about the agreement from October of '02 that was causing us any heartache, so we just went on down the road with it.[56]

Later management agreements, including the 2003 Management Agreement, however, lack the shortfall language providing that "[i]n the event that the amount of [National Land Partners] profit participation . . . exceeds the total Net Profit, then [HCWV] shall receive no profit participation and shall be liable to [National

---

[54] Specifically, the Project Addendum and accompanying Schedule were terminated in April 2003. Miller emphasizes the termination language providing that these agreements "are and shall be deemed null and void and terminated *ab initio*, and shall have been of no force or effect whatsoever at any time." JX 13. At trial, she asserted that the Project Addendum "was never binding to Ashton Woods" because this agreement was superseded by the 2003 Management Agreement. Trial Tr. 461:6-462:24 (contending, additionally, that the Project Addendum was "not properly executed" because "[t]he content was not correct").

[55] *Id.* at 138:22-139:3.

[56] *Id.* at 140:11-20.

Land Partners] for any shortfall amount."[57] The Defendants argue that this language, providing for Negative Manager Fees, was "mistakenly omitted" from these agreements.[58] Wilson, for one, did not read the 2003 Management Agreement (or other management agreements) closely.[59] At trial, he described his approach as the Defendants transitioned from the Project Addendum to the 2003 Management Agreement:

> This was a management agreement. I had seen these before. I was pretty comfortable with them. I looked at the percentages. I knew what a management agreement was. I had worked under it for years before. No. I didn't pay close attention other than to look at my percentages matched up from one to the other. Plus the deal was already running. . . . Would have been the 12 1/2 percent, would have been the stuff over $3 million—the timber proceeds over $3 million. The schedule probably included something to do with financing and different things like that. I would have looked at the budget numbers to make sure all the budget numbers stayed correct with the deal.[60]

Similarly, Patten rarely read the agreements into which he entered closely.[61]

National Land Partners contends that this shortfall language was omitted as a result of a scrivener's error. National Land Partners emphasizes that this shortfall language is reflected in the Project Addendum, which was used as a template for the 2003 Management Agreement, and conjectures that, when eliminating the last

---

[57] *See* JX 5 at NLP000156; JX 9 at HUNTER000101-102.
[58] *See, e.g.*, Hunter Defs.' Pre-Trial Op. Br. at 11.
[59] Conversely, Wilson testified that the Project Addendum "was brand new to me, and I would have read it very closely." Trial Tr. 130:15-16.
[60] *Id.* at 139:5-20.
[61] *Id.* at 35:21-23, 41:8-10. Patten also "authorized others to sign [his] name to contracts between National Land Partners and [HCWV]." *Id.* at 42:21-24; *see also id.* at 79:7-80:9.

sentence in Section 6.2 of the Project Addendum—a sentence that was no longer relevant—this shortfall language was inadvertently deleted. Murray, who drafted the Project Addendum and the relevant management agreements among the Defendants, testified that the shortfall language was removed because:

> I made a mistake. I inadvertently deleted it. That's the best I can determine as to how it happened. The project addendum had an additional sentence beyond this, and near as I can determine, when I was deleting the last sentence, I also overdeleted and didn't catch myself.[62]

The 2003 Management Agreement was then used as a template for later agreements, meaning that the alleged scrivener's error was carried over into and reflected in these later documents.[63] Consequently, when the Defendants decided to change the profit allocation of timber proceeds and thereby entered into the 2004 Management Agreement, "the mistake perpetuated itself."[64] Additionally, the Defendants contend that their course of dealing over a protracted period demonstrates that the parties intended to account for Negative Manager Fees in the

---

[62] *Id.* at 287:8-13; *see also id.* at 293:16-18 (Murray) (noting that "[t]he information that I used to draft the [2003 Management Agreement] was the information that was in the project addendum"); JX 40 (Murray Aff.) ¶ 30.

[63] *See, e.g.*, Trial Tr. 297:1-4; *id.* at 297:12-16 (Murray) ("I use the previous agreement as a template and change what needs to be changed. And when I created this agreement, I didn't notice that the phrase was missing; therefore, I didn't add it at this point."); *see also id.* at 254:23-255:2 (Murray) (describing how he would reduce agreements between Wilson and Patten into contract form: "I would start with a previous agreement, and it would be on my computer, and I would simply cut, paste, delete, and create the new agreement from the previous.").

[64] *Id.* at 297:4; *see also id.* at 153:3-11 (Wilson) ("The reason this [2004] [M]anagement [A]greement is here is because the—this is for a different project, and had different—a different amount of timber, so they changed the timber proceeds . . . . And this project didn't have shortfall language. It got left out. Just got left out by accident. But the deal was the same as the deal had always been since October of '02.").

20

2003 and 2004 Management Agreements, as their arrangement since 2001 has "provided for the accrual and/or offset of negative manager fees."[65]

Conversely, Miller contends that this language was intentionally removed by the Defendants and that the 2003 and 2004 Management Agreements as currently written accurately reflect the profit allocation between HCWV and National Land Partners. Miller, who remembers a protracted period of "negotiations" following the Bermuda trip, testified that the 2003 Management Agreement was not initially consistent with Wilson and Patten's discussions in Bermuda. She emphasized Wilson's dissatisfaction with Murray as he drafted an agreement that did not comport with Wilson's understanding of the deal, explaining that

> [Wilson] went back and forth with [Murray] for months about the terms of it. [Wilson] would get a fax. I would get the fax, put it in his office, bring it home to him, whatever the case may be. He would go through it. He was very upset through most of the negotiations of that agreement. . . . He was upset that [Murray] did not get the terms right, that it was not what [Wilson] had agreed to with [Patten].[66]

When asked by her attorney with which terms Wilson and Murray disagreed, she responded: "The money."[67] She further clarified, "[t]he timber, the percentage of profit to Mr. Patten, National Land Partners."[68]

---

[65] Hunter Defs.' Pre-Trial Op. Br. at 2; *see also* Trial Tr. 148:4-7 (Wilson) ("The shortfall obligation, it does—it may not be in the main management agreement, but it's the same deal him and I shook hands on and have done business with for all those years."); *id.* at 295:9-11 (Murray) ("My understanding was that [the 2004 Management Agreement] was identical to all the previous agreements and that negative manager fees could happen.").

[66] *Id.* at 422:17-423:2.

[67] *Id.* at 423:3-5.

21

When asked specifically about whether Wilson made changes to Section 6.2, Miller replied: "Of course. That is what he had negotiated with Mr. Patten. It was the most important part of our agreement."[69] However, she could not testify to what specific changes were made to the 2003 Management Agreement, although she noted "it was pretty significant," as "he would cross out sentences and paragraphs."[70] In fact, although Miller noted that she and Wilson discussed the "guarantee" and "[t]hat he crossed it out actually, and he said it is not supposed to be on there,"[71] when her attorney asked, "You saw him cross it out?" she replied vaguely: "I saw many of his contracts. But yes, that's what he did. He would cross it out . . . ."[72] Miller, who testified that she did not know the terms of the Defendants' negotiations until their agreement was finalized,[73] also "did not read [the finalized agreement] word for word" because "[she] trusted [her] husband. He was a wonderful negotiator, and . . . he showed [her] the highlights. He showed [her] the important things to [them] that differed from the previous."[74]

---

[68] *Id.* at 423:7-8.

[69] *Id.* at 488:24-489:2.

[70] *Id.* at 488:15-16.

[71] *Id.* at 423:9-13.

[72] *Id.* at 423:14-16.

[73] *Id.* at 421:15-22 (noting that she "didn't know [the precise terms] until the final terms, until the agreement was completely finished . . ."); *but see id.* at 424:14-17 (affirming that she had seen earlier, inaccurate drafts of the 2003 Management Agreement).

[74] *Id.* at 486:24-487:4; *see also id.* at 484:15-19 (noting that "[Wilson] spoke with [her] at length about a lot of his agreements as far as . . . what contract he was writing, rewriting, passing back and forth, finalized, and specifically the management agreements").

Under Miller's understanding of the alleged renegotiation, if a project did not make a profit, or made a profit of less than 12.5%, HCWV was *not* obligated to pay the difference to National Land Partners. According to Miller, that agreement was reached during the Bermuda trip in July 2002, but the October 2002 Project Addendum, which initially governed the Ashton Woods Project, *did* include Negative Manager Fees. In fact, it was not until that agreement was restated in the 2003 Management Agreement, which also governed Ashton Woods, that the Negative Manager Fee provision was dropped.

F. *The Divorce*

In June 2005, Miller filed for divorce in the Family Court of Berkeley County, West Virginia.[75] At that point, HCWV was managing six ongoing real estate projects for National Land Partners, each governed by either the 2003 or 2004 Management Agreements.[76] According to Miller, she and Wilson thereafter agreed that, in exchange for Miller distributing her 50% interest in HCWV to Wilson, she "would receive the value of her 50% interest at equitable distribution."[77] However, the value of Wilson's manager fees as of the date of

---

[75] *Wilson v. Wilson*, 706 S.E.2d 354, 358 (W. Va. 2010).

[76] The following projects were ongoing when Miller and Wilson separated: Ashton Woods, Crossings, Overlook at Greenbrier, Springs at Shepherdstown, Westvaco, and the Point. JX 41 (Wilson Aff.) ¶¶ 10-11 (noting that Negative Manager Fees were incurred for the Pointe and Westvaco Projects).

[77] Am. Compl. ¶ 9.

23

separation, a valuation critical to equitable distribution, was uncertain.[78]   On November 21, 2008, the Berkeley County Family Court entered a final order of divorce, finding that the net value of HCWV was $8,927,957 and ordering Wilson to pay over $4.9 million plus interest to Miller.[79]   Although that decision has been reversed and remanded, it was this decision that precipitated the filing of the matter pending before me.

Specifically, although the shortfall language is missing from the 2003 and 2004 Management Agreements, the Defendants accounted for Negative Manager Fees when projects failed to generate sufficient gross sales to satisfy National Land Partners' preferential profit.   In fact, in December 2008, following the initial judgment of the Family Court, HCWV transferred approximately $5 million to National Land Partners, most of which accounted for the payment of Negative Manager Fees.   Miller, in her Amended Complaint, contends that this payment was not required under the terms of the Defendants' agreement, and that Wilson paid

---

[78] *See, e.g.*, July 31, 2013 Oral Arg. Tr. 7:6-9 ("[T]he only issue that's ever been contested in the State of West Virginia in this divorce is the marital interest in the Hunter Company of West Virginia."); *id.* at 56:6-11 ("There was a stipulated equitable distribution amount that was determined between the parties and paid over by Mr. Wilson to the plaintiff.  That included Hunter Company's value.  The only portion that remained was the value attributable to the pre-separation date management fees."); *see also Wilson*, 706 S.E.2d at 358 ("By May 2008, the parties had divided their personal property and identified and stipulated to the value and distribution of all of their marital assets and debts, except for the calculation and valuation of Hunter's manager fees."); *id.* at 359 (noting that "the sole issue in contention that was litigated before the family court was the valuation of [Wilson's] manager fees on the projects that existed at the date of separation for purposes of equitable distribution").

[79] JX 27 (noting, additionally, that Wilson had previously paid Miller over $4.3 million).

these fees, purportedly owed by HCWV, to impede her ability to collect at equitable distribution.

However, as noted above, the Defendants contend that Negative Manager Fees were very much a part of their arrangement, albeit inadvertently deleted from the 2003 and 2004 Management Agreements, as well as the 2006 Management Agreement between National Land Partners and Wilson's Virginia company, an agreement not implicated by equitable distribution.

In fact, Wilson testified that he first learned that this shortfall language was absent on April 6, 2012, at a deposition during the pendency of his divorce proceedings. As Wilson recounted at trial, during this deposition, he realized that this language was missing "because I had to read the document while [Mr. Campbell, Miller's attorney] was there staring at me. And [the shortfall language] wasn't in there."[80] Although this language was missing, Wilson emphasized at trial that "[the shortfall language] may not be in the main management agreement, but it's the same deal [Patten] and I shook hands on and have done business with for all those years."[81]

---

[80] Trial Tr. 143:21-144:3.
[81] *Id.* at 148:4-7.

Following his April deposition, Wilson contacted Murray, who was also unaware that the shortfall language was missing.[82] Murray's state of mind is reflected in an email from Murray to Wilson and others, on April 11, 2012, which reads:

> Please take a look at the Project Addendum which begins on Page 11 of the attached scan. As I have previously testified in Court [in West Virginia], the [2003] Managements Agreement was created to replace the Project Addendum and was intended to have identical terms. It appears that when I created the replacement Management Agreement I inadvertently omitted an important portion of section 6.2. At the top of page 12 of the Project Addendum are the words ". . . and shall be liable to Company for any shortfall amount." These words explain the way we have accounted for the Negative Manager Fees all of these years.[83]

Importantly, Murray had previously testified, during Miller and Wilson's divorce proceeding in May 2008, that HCWV "bears all the risk of loss and enjoys all of the potential profit that a project can receive after National Land Partners receives a guaranteed percentage of sales as its compensation."[84]

G. *The Economy*

Although Miller emphasizes the timing of HCWV's payment of millions in Negative Manager Fees so soon after the family court's award concerning

---

[82] *See, e.g.*, *id.* at 303:14-22 ("My first reaction was you got to be kidding me. But when I went back and looked at those agreements and realized that it wasn't there, I started trying to figure out what happened, and it caused me to keep looking back. I looked at the project addendum. I looked at the previous management agreement, saw the language there, put two and two together and said, 'I can see what I did. I made a mistake.'").

[83] JX 35 at NLP000332.

[84] JX 55 at 131:2-6.

26

equitable distribution as indicative of fraud, the timing of the real estate market crash is also relevant here.

In the early to mid-2000s, the real estate business was booming. During this period, HCWV was extremely profitable, as was National Land Partners, although HCWV made more money—sometimes much more—from their joint projects. To illustrate, the Ashton Woods Project generated over $11.5 million for the HCWV and approximately $6 million for National Land Partners.[85] Similarly, the Crossings on the Potomac Project generated over $4.4 million for HCWV and only $2.5 million for National Land Partners.[86] This outcome was driven by the fact that National Land Partners was subject to a capped preferential profit, while HCWV earned all gross sales beyond National Land Partners' 12.5%.

Both parties were aware that this arrangement was leading to outsized profits for HCWV. However, when asked at trial why he did not change the deal back to the original 50/50 arrangement, Patten explained his reasoning as follows: "Because I had made an agreement with Mr. Wilson and I pride myself on keeping my agreements. My word is my word. And he's always been that way with me and I've always been that way with him."[87] Wilson was also not unaware of this disparity in profits, but noted that "[Patten] didn't begrudge me when I was making

---

[85] Trial Tr. 279:6-8.
[86] *Id.* at 290:23-291:3.
[87] *Id.* at 44:7-11.

27

a lot of money, and he never tried to change the deal when we were doing really good."[88]

Then, the real estate market came crashing down.[89]   Patten noted that, as a result, "[Wilson's] sales slowed way down and . . . it became more expensive to sell, became more difficult to find prospects.  And it became very difficult to make a profit."[90]  Wilson similarly recalled that "everything went down the tubes pretty quick. . . . There's no sales, bank stops lending money, it's just a perfect storm."[91]  As to their joint projects, Patten recalled that they "lost money, and the—what [they] call the negative management fees increased."[92]

The Defendants accounted for Negative Manager Fees on a monthly basis,[93] and financial statements of National Land Partners that were presented during trial reflect that the Defendants contemplated, and accounted for, Negative Manager

---

[88] *Id.* at 141:11-13.

[89] At trial, Patten recounted that "[i]t was like somebody shut the lights off in the room.  I mean the whole real estate market collapsed.  Sales collapsed.  And it was a very, very difficult time for not only my company, but other companies."  *Id.* at 46:13-17.

[90] *Id.* at 46:22-47:1.

[91] *Id.* at 134:15-17.

[92] *Id.* at 47:19-21.

[93] *See, e.g.*, *id.* at 336:13-20 (Murray) ("The purpose [of accruing negative manager fees] was for us to understand where we were in each of his projects.  We owned the projects and we were preparing our financial statements, so every month when we did our financial statements, we needed to know did we make money, did we lose money, where do we stand.  So the purpose of accruing them was to get our financial statements as accurate as possible.").

Fees.[94]  In fact, Negative Manager Fees had previously been incurred by HCWV

during certain months of ongoing projects.[95]  As Wilson testified,

> [t]here were months . . . like in December, when it's hard to sell real
> estate in December, but you still—I still got secretaries to pay, I still
> got electric to pay, I've still got all these expenses to pay, where we
> didn't have sales.  There were months that we had negative—a
> negative number.  The good news was the good months outweighed
> what few bad months we had.[96]

However, the recession had a noticeable impact on the Defendants' joint projects,

leading to the accrual of Negative Manager Fees for completed projects.[97]  In fact,

Negative Manager Fees became so "unsustainable" that in October 2008, before

the West Virginia family court first ruled on his divorce, Wilson asked Patten to

change this profit allocation during a meeting in Atlanta, Georgia.[98]  Though the

---

[94] *See, e.g.*, JX 8; JX 21.  The Plaintiff challenges the "probative value" of the manager fee schedules and financial statements presented by the Defendants.  *See* Miller's Pre-Trial Answering Br. at 7; *see also* Trial Tr. 27:6-11.  I am cognizant of the fact that HCWV's accrual of Negative Manager Fees accelerated post-separation, which, according to the Plaintiff, demonstrates the unnecessary and collusive nature of the payments made.

[95] In fact, Murray testified that a manager fee schedule was "prepared every month, starting with the beginning of a project . . . when National Land Partners was receiving a . . . [p]referred percentage of sales and a preferred percentage of timber proceeds."  *Id.* at 306:21-307:5; *see also id.* at 307:9-13; *id.* at 317:10-14 (Murray) ("[Wilson] might not have received them regularly.  If he asked about manager fees, they would have been sent to him, but I don't believe we were routinely sending these every month, as we did the financials.").

[96] *Id.* at 206:13-22.

[97] *See, e.g.*, JX 40 (Murray Aff.) ¶ 17.

[98] *See, e.g.*, Trial Tr. 48:2-9 (Patten) ("Mr. Wilson came to me in October [2008] at a meeting in Atlanta . . . and said, 'Look, I'm choking to death on this.  I got to change the deal.'  And I—we sat, and I said, 'Look.  We'll go back to the original 50/50 deal.  We put a deal together and we make it, you get half, I get half.  If not, it's the same.'"); *id.* at 169:17-170:11; *id.* at 300:21-301:4; *id.* at 301:22-302:9 (Murray) ("A couple things happened at that meeting.  Mr. Patten agreed to go back to the old 50/50 arrangement and stop taking a preferred percentage of profits.  He also agreed to give Mr. Wilson a reduction for what Mr. Wilson considered to be excessive marketing that we had incurred.  And we also talked about Mr. Wilson's commission should we

29

parties decided to return to their original 50/50 arrangement, this has not yet been reflected in any written agreements.[99]

Further, although the parties changed their profit arrangement, HCWV continued to pay the Negative Manager Fees incurred prior to this modification, despite the fact that the shortfall language was missing from the 2003, 2004, and 2006 Management Agreements. Notably, pursuant to the 2006 Management Agreement, Wilson has caused his Virginia company to pay Negative Manager Fees to National Land Partners. Yet, this project was, in Wilson's words, "all post-marital and has nothing to do with anything in our divorce."[100]

H. *The December 2008 Transfer*

According to the Defendants, as of November 2008, the Westvaco, Pointe and Black Diamond Ranch Projects did not produce enough profit to satisfy National Land Partners' preferential payment, leading to the accumulation of over $4.5 million in Negative Manager Fees.[101] Additionally, HCWV also owed National Land Partners for cancelled project costs, as well as certain overpayments

---

acquire the Hamer project, that it would be applied to the negative—to the liabilities that Hunter Wilson's companies had to National Land Partners . . . as a result of operating losses and negative manager fees.").

[99] *Id.* at 302:20-21 (Murray) ("It was not [memorialized in writing]. It was a handshake, and I never got around to writing an amendment.").

[100] *Id.* at 165:13-14.

[101] JX 40 (Murray Aff.) ¶ 17.

associated with the Ashton Woods and Shepherdstown Projects.[102] As an offset, however, HCWV was owed manager fees for the Overlook at Greenbrier and Long Projects. Nevertheless, even after offsetting what HCWV owed National Land Partners with what National Land Partners owed HCWV, HCWV owed National Land Partners over $3.1 million.[103]

In December 2008, HCWV earned a $3.4 million acquisition commission from a National Land Partners' affiliate (the "Hamer Commission"). Because HCWV owed National Land Partners over $3.1 million, the Defendants agreed that this commission would be paid directly to National Land Partners to partially offset the amount that HCWV owed.[104] Murray notes that, at the time of this Hamer Commission offset, a portion of HCWV's profits from the Overlook at Greenbrier and Long Project "were also applied to repay Negative Manager Fees."[105] At trial, Wilson explained that these fees were paid to National Land Partners through accounting transfers, noting that "I never got the money to give the money back. They just moved the money from WV Hunter, LLC, to National

---

[102] *Id.* at ¶¶ 16, 18; *see also* Trial Tr. 289:8-14; *id.* at 289:21-290:1 (Murray) ("Hunter Company of West Virginia, under the terms of our agreement, had responsibility for all operating losses, and our share was strictly a percentage of sales of timber and a percentage of sales of lots.").

[103] JX 40 (Murray Aff.) ¶¶ 19-21.

[104] *See, e.g.*, *id.* at ¶ 21.

[105] *Id.*; *see also* JX 41 (Wilson Aff.) ¶ 6 ("The purpose of the assignment of the Hamer commission or fee was to offset negative manager fees created primarily by the downturn in the economy on several land development projects in which HCWV was the manager.").

31

Land Partners, or whatever company they were moving it to."[106] According to the Defendants, the timing of this December 2008 transfer was based not on the issuance of the West Virginia family court's order, but was instead "tied entirely to the commission on the Hamer property becoming due and payable."[107]

I. *Summary of Management Agreements*

Figure I illustrates in graph form the agreements under which HCWV worked with National Land Partners. As represented, until September 26, 2001, the profits were split 50/50; between late September 2001 and mid-April 2003, including under the Project Addendum that initially governed the Ashton Woods Project, National Land Partners was guaranteed a preferential profit, and HCWV received everything above that amount. During that period, HCWV was also responsible to National Land Partners for any shortfall, however, via the Negative Manager Fees. After mid-April 2003, the management agreements maintained the

---

[106] Trial Tr. 165:23-166:3; *see also id.* at 132:8-13 (Wilson) (explaining that National Land Partners did not "take money out [until] all the lots are sold and all the bills are paid, unless they're paying some taxes or something if it's a multi-year project. But normally they don't take their money out until the tail end of the deal, like we do.").

[107] JX 40 (Murray Aff.) ¶ 22; *see also* Trial Tr. 224:10-19 (Wilson) ("That commission was used to offset negative manager fees, because we had this discussion—[Murray], [Patten], and myself—either last of September, first of October of '08, on how I was going to repay the negative manager fees that were continuing to accumulate. And also because I had went to [Patten] because—I was losing my tail, and he was nice enough to go back to the 50/50 deal. But we discussed in October of '08 how I was going to pay back the fees."); *id.* at 224:23-24 (Wilson) (noting that the Hamer Commission "was the only way at the time I could get the bulk of the money paid back"); *id.* at 302:4-9; JX 41 (Wilson Aff.) ¶ 6 (". . . the [Hamer] commission was assigned to WV Hunter LLC, NLP's subsidiary, on December 1, 2008. The purpose of the assignment of the Hamer commission or fee was to offset negative manager fees created primarily by the downturn in the economy on several land development projects in which HCWV was the manager.").

preferential profit provision for National Land Partners and left in place all the upside potential, once the preferential profit was satisfied, to HCWV; however, agreements during this period omitted the downside responsibility of HCWV.

## II. PROCEDURAL HISTORY

On October 24, 2012, Miller filed a Verified Complaint, subsequently amended, alleging that the Defendants have wrongly interpreted their management agreements and that HCWV paid certain fees to National Land Partners for the sole purpose of obstructing her ability to collect at equitable distribution. In Count I, Miller requests a declaratory judgment that neither Section 4.3 nor Section 6.2 of the parties' management agreements authorized the sums paid by HCWV to National Land Partners in December 2008, which included the payment of Negative Manager Fees. In Count II, Miller requests an order voiding the December 2008 transfer as fraudulent, pursuant to the Delaware Uniform Fraudulent Transfer Act. In Count III, Miller requests the imposition of a constructive trust over any funds fraudulently transferred from HCWV or Wilson to National Land Partners.

On April 1 and 2, 2013, the parties filed Cross-Motions for Summary Judgment. This matter was briefed, and at argument on July 31, 2013, I denied the parties' Cross-Motions as to Count I. At that time, I communicated the utility of holding a brief evidentiary hearing on the limited issue of whether there exists a

33

basis for reforming the 2003 and 2004 Management Agreements.[108] Further, I stayed my decision as to Counts II and III.

A two-day trial was held on December 18, 2013 and February 4, 2014. The parties completed post-trial briefing on March 19, 2014. This is my Post-Trial Memorandum Opinion.

### III. LEGAL STANDARD

The Defendants seek reformation of the 2003 and 2004 Management Agreements, which they executed to govern their joint real estate development projects. This Court may reform a contract when a "written instrument fails to express the [parties'] real agreement or transaction."[109] To achieve reformation, the movant must demonstrate either a mutual mistake of the contracting parties, or a unilateral mistake by one contracting party and knowing silence by the other.[110] In cases of mutual mistake, the movant must demonstrate, by clear and convincing evidence, that "the parties' actual (oral) agreement was not accurately reflected in their executed written contract."[111] To satisfy this burden, the movant "must

---

[108] Delaware is designated as the exclusive forum in which to litigate disputes arising from those agreements. *See* JX 11 at § 10.5; JX 17 at § 10.5.
[109] *Amstel Assocs., L.L.C. v. Brinsfield-Cavall Associates*, 2002 WL 1009457, at *5 (Del. Ch. May 9, 2002) (internal quotation marks omitted).
[110] *Id.*
[111] *Id.*

34

persuade the Court of the precise, orally-agreed-to terms that it seeks to have judicially inserted into the contract."[112]

## IV. ANALYSIS

Here, the Defendants contend that they mutually agreed that HCWV would be responsible for Negative Manager Fees, but that this term was inadvertently left out of the management agreements at issue due to a scrivener's error. Alternatively, the Defendants contend that their course of conduct demonstrates that Negative Manager Fees were included in their arrangement.

I find the evidence clear and convincing that the 2003 and 2004 Management Agreements as written do not reflect the Defendants' arrangement. A prior management agreement and a project addendum, entered into before the agreements at issue, clearly accounted for Negative Manager Fees. However, after the contracting parties transitioned from a "project addendum" form back to the management agreement form, this language went missing. I find that it was inadvertently removed when Murray intentionally deleted a sentence that appeared in the Project Addendum—following the shortfall language—from the 2003 Management Agreement, which was then used as a template for the 2004 Management Agreement. In other words, I find that in removing the surplus language from the Project Addendum to form the 2003 Management Agreement,

---

[112] *Id.*

Murray also, inadvertently, removed the language making HCWV liable for Negative Manager Fees.

This explanation is strengthened by the fact that the Project Addendum—which provided for Negative Manager Fees—governed the Ashton Woods Project, which was already underway when that Addendum was terminated and the 2003 Management Agreement was executed, suggesting that the parties did not intend to change their arrangement during this transition.[113] In fact, Wilson's testimony confirms this; he testified: "[a]ll we did was change [the] form of documents. Any negotiation or anything that was done with this deal was done with Harry in July of '02, the year before. We already had the deal running. We weren't going to change horses in the middle of the road."[114]

Moreover, the Defendants credibly and clearly demonstrated at trial that they did not intend to change the terms of their arrangement between the Project Addendum and the later management agreements. Rather, the parties continued to account for Negative Manager Fees while pursuing their joint projects.[115] Further,

---

[113] Although other provisions were changed when the parties transitioned from the Project Addendum to the 2003 Management Agreement, including the language of Section 4.3, it is clear from the Defendants' testimony that their arrangement contemplated Negative Manager Fees, and that they believed that accrual of these Fees was provided for in Section 6.2 of the 2003 and 2004 Management Agreements.

[114] Trial Tr. 138:22-139:3.

[115] *See, e.g.*, *id.* at 326:14-17 (Murray) (being asked, "[o]n how many occasions did Mr. Wilson object to the accrual of negative manager fees on these [financial] statements," and responding "[n]one that I know of"); *see also id.* at 148:4-7 (Wilson) ("The shortfall obligation, it does—it may not be in the main management agreement, but it's the same deal him and I shook hands on

36

Wilson's Virginia company paid Negative Manager Fees to National Land Partners although the shortfall language is absent from the governing 2006 Management Agreement, and the project for which these fees were incurred is not related to the West Virginia divorce proceedings.[116]

Although Miller tries to impute a nefarious purpose to HCWV's decision to pay certain Negative Manager Fees in December 2008, shortly after a West Virginia family court first ruled on her equitable distribution, I find that this timing does not demonstrate that these fees were not owed under the Defendants' arrangement. Miller, in effect, wants me to conclude that Wilson caused HCWV to pay millions of dollars in Negative Manager Fees to National Land Partners that it did not actually owe, and that Wilson knew it did not actually owe, in order to spite her or obstruct her ability to collect at equitable distribution. I find this conclusion to be an unreasonable one, and not supported by the parties' testimony at trial, nor the record before me. In fact, at trial, Wilson emphasized: "Why would I pay a company 5 or $6 million that I didn't have to on the whim that I may or may not owe my ex-wife some money? It just doesn't make sense. You wouldn't spend $10 to save $1, would you?"[117] Wilson also testified that he planned on

_____

and have done business with for all those years."); *id.* at 163:11-16 (Wilson) ("My understanding was the same as my understanding has been since the project addendum in '02; was that if the projects did good, I made money. If they fell on their face, as they did with the economy here that destroyed everything, now I owe money because the projects didn't do as good.").

[116] *See id.* at 165:6-14.

[117] *Id.* at 170:12-16.

appealing the West Virginia court's decision, which he did; that decision has since been reversed and remanded. While I realize that spiteful and self-destructive behavior is not unheard of in the divorce context, as neither is collusive behavior to shield funds from ex-spouses, nothing in the record or in the demeanor of the defense witnesses suggests that such is the case here.

Further, although Negative Manager Fees rarely accrued before 2006, the market crash had a noticeable impact on the Defendants' joint projects, and these Fees understandably began to accrue rapidly. As the Defendants testified, they discussed, prior to the West Virginia family court making any decision on equitable distribution, a return to their original 50/50 arrangement, as Wilson was facing "unsustainable" levels of Negative Manager Fees.

Miller points out that the accounting statement laying out the fees paid by HCWV to National Land Partners in December 2008 appears to have been created on a Sunday; she suggests that this indicates the Defendants were working together for some fraudulent, or at least extraordinary, purpose. Murray, however, explained that this accounting statement was not actually prepared on a Sunday. Rather, as he explained, National Land Partners' accounting adheres to a "4-4-5 month" schedule, meaning that

> rather than having our year and our individual months end on calendar days, they end on a Sunday. So in the first quarter of the year, January has four weeks ending on a Sunday, February has four weeks

38

> ending on a Sunday, and March has five weeks ending on a Sunday. . . . [T]hey rarely coincide with the month-end.[118]

Accordingly, Murray explained, Sunday was not the day that this accounting statement was prepared, but rather, corresponds to "the month-end date on which we are doing the journal entry that will distribute [the Hamer] commission."[119]

Further, it is clear from the record that the Defendants were unaware that the shortfall language had been omitted until Wilson's deposition in April 2012. The email later sent by Murray—who testified at the West Virginia divorce proceeding that HCWV "bears all the risk of loss and enjoys all of the potential profit that a project can receive after National Land Partners receives a guaranteed percentage of sales as its compensation"[120]—confirms this.

Furthermore, Miller's testimony does not rebut the clear and convincing evidence presented by the Defendants at trial. Although Miller testified that Wilson and Patten, during their trip to Bermuda in July 2002, agreed to eliminate Negative Manager Fees, she was not a party to the agreements at issue, and was not privy to the negotiations between Wilson and Patten. Miller, furthermore, offers no convincing explanation as to why the Defendants included Negative Manager Fees in the October 2002 Project Addendum, which was entered into mere months after the Bermuda trip. Miller, instead, focuses on her observations

---

[118] *Id.* at 321:9-20.
[119] *Id.* at 330:1-4.
[120] JX 55 at 131:2-6.

of and discussions with Wilson as he negotiated the 2003 Management Agreement. Specifically, Miller remembers that Wilson crossed out the "guarantee" and "said it is not supposed to be on there."[121] However, when her attorney followed up by asking: "You saw him cross it out?" Miller, instead of confirming that she saw Wilson cross out the shortfall language, replied indirectly: "I saw many of his contracts. But yes, that's what he did. He would cross it out . . . ."[122] Miller, however, neither credibly nor consistently testified that Wilson told her that the Negative Manager Fees were taken out of the Agreement, or that she saw him crossing out the shortfall language in particular.[123] In other words, Miller's testimony is entirely consistent with an attempt by a fundamentally honest and moral person to testify in support of a position she sincerely believes in but cannot directly confirm without uttering a lie. Thus, from Miller's testimony, it is clear that, during the negotiations involving the Ashton Woods Project and the 2003 Management Agreement, Wilson was initially anxious, subsequently happy, and

---

[121] Trial Tr. 423:11-13.

[122] *Id.* at 423:14-16.

[123] *See, e.g.*, *id.* at 488:17-21 (answering the question "What specific changes did Mr. Wilson make to Section 6.2 of this agreement and fax back to National Land Partners?" with the following response: "I will not tell you the specific. *I can't tell you the specific.*") (emphasis added); *id.* at 488:4-16 ("Q. You have no knowledge as to the changes he made to that agreement and faxed back, do you? A. I watched my husband for many days, weeks, and then into months go back and forth, correcting, changing, updating his management agreement. Q. But you have no idea what those changes were? . . . A. No, but it was pretty significant. I mean, he would cross out sentences and paragraphs."); *id.* at 493:21-494:4 ("Q. What did he tell you? That he no longer guaranteed a profit to [National Land Partners]. That's what you said he told you when he finalized this in April of 2003; correct? A. He told me that it was over. He was—as I said, he was very happy. The final management agreement was done, and we could move on and do business.").

then later frustrated with Murray as they negotiated unspecified deal points. That is insufficient to rebut the clear and convincing evidence presented by the Defendants demonstrating that a scrivener's error in fact occurred, and that Section 6.2 as written does not accurately reflect their arrangement.[124] To be clear, to the extent I must resolve discrepancies between Miller's testimony, on one hand, and that of Wilson, Murray and Patten, on the other, I find the latter three to be credible.[125]

## V. CONCLUSION

Because I find that the Defendants have carried their burden of demonstrating, by clear and convincing evidence, that Negative Manager Fees should have been accounted for in Section 6.2 but were left out due to a scrivener's error, I find it appropriate to dismiss Count I of Miller's Amended Complaint, and to reform Section 6.2 of the 2003 and 2004 Management Agreements to reflect the parties' true agreement. The parties should confer and inform me what, if any,

---

[124] Because I find that Section 6.2 must be reformed, I need not address the parties' arguments as to Section 4.3 of the Management Agreements at issue.

[125] This is despite, and in light of, the Berkeley County Family Court's March 2, 2012 Order, JX 34, and Miller's testimony that Wilson was fired from the Patten Corporation in the early 1990s for misappropriating funds, Trial Tr. 400:5-16; *see also id.* at 401:23-402:23 (explaining that, following their termination from Patten Corporation, Patten contacted Wilson and Miller to discuss a potential partnership; Miller recounted that Patten told them: "'I am interested in backing you. I would like to be your partner. You know what happened at Patten Corporation was wrong, I know it was wrong, and we are going to move on from it. We are going to do business together.'").

issues remain in this matter, and should submit an appropriate form of Order consistent with this Memorandum Opinion.

Figure I

| Agreement | Parties | Dated | Effective | Profit Distribution | Shortfall Language | Projects |
|---|---|---|---|---|---|---|
| 2000 Management Agreement | HCWV; NLP; Wilson | July 17, 2000 | July 17, 2000 | 50/50 | N/A | Berkeley Glen; Meadows at Sleepy Creek |
| 2002 Management Agreement | HCWV; NLP; Wilson | January 15, 2002 | September 26, 2001 | NLP Preferential Profit:<br>- 10% gross lot sales<br>- 12.5% gross timber proceeds | Yes | River Ridge |
| **July 2002: Bermuda Trip** | | | | | | |
| Project Addendum | HCWV; NLP; Wilson | October 15, 2002 | October 15, 2002 | NLP Preferential Profit:<br>- 12.5% gross lot sales<br>- 12.5% first $3 million of gross timber proceeds<br>- 42.5% gross timber proceeds over $3 million | Yes | Ashton Woods |
| **April 14, 2003: Project Addendum Terminated** | | | | | | |
| 2003 Management Agreement | HCWV; NLP; Wilson | April 14, 2003 | October 15, 2002 | NLP Preferential Profit:<br>- 12.5% gross lot sales<br>- 12.5% first $3 million of gross timber proceeds<br>- 42.5% gross timber proceeds over of $3 million | No | Ashton Woods; Crossings on the Potomac; Westvaco Romney Tract |
| 2004 Management Agreement | HCWV; NLP; Wilson | December 3, 2004 | November 3, 2004 | NLP Preferential Profit:<br>- 12.5% gross lot sales<br>- 12.5% first $700,000 of gross timber proceeds<br>- 42.5% gross timber proceeds over $700,000 | No | Westvaco Greenbrier Tract – Hart's Run; The Pointe; Long Project |
| **June 2005: Miller Files for Divorce** | | | | | | |
| 2006 Management Agreement | Hunter CO of VA, LLC; NLP; Wilson; | August 18, 2006 | August 8, 2006 | NLP Preferential Profit:<br>- 12.5% gross lot sales<br>- Timber proceeds as outlined in Schedule | No | Black Diamond Ranch |
| **October 2008: Defendants Agree to Return to 50/50 Arrangement** | | | | | | |